IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MUWAKKIL SEIFULLAH BEY SHABAZZ,

      Plaintiff,

v.                                   Civil Action No. **3:10CV190**

PRISON HEALTH SERVICES, INC., *et al.*,

      Defendants.

## MEMORANDUM OPINION

Muwakkil Seifullah Bey Shabazz ("Plaintiff"), a Virginia prisoner proceeding *pro se*,

filed this action pursuant to 42 U.S.C. § 1983. Plaintiff asserts a violation of the Eighth

Amendment[1] in that prison officials[2] subjected him to cruel and unusual punishment, denial of

medical care, and delay of medical care. Three defendants—Prison Health Services, Inc.

("PHS"); Dr. Toney King; and Head Nurse Underdue (collectively "Defendants")—filed a

motion to dismiss (Docket No. 18), providing Plaintiff with appropriate *Roseboro*[3] notice

---

[1] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[2] Plaintiff sued Prison Health Services, Inc.; Dr. Toney King; Head Nurse Underdue; Nurse Jane Doe 1; Nurse Jane Doe 2; the Virginia Department of Corrections; Health Services Director Fred Schilling; Chief Warden George Hinkle; Assistant Warden Alderman; Unit Manager Carpino; Lieutenant Brown; Officer Moody; Officer Maryland; and Lieutenant Scott. Respondent refers to Nurse Underdue as "Nurse Terry." For purposes of this Memorandum Opinion and Order, the Court will use the name that Plaintiff uses.

[3] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

(Docket No. 17). Plaintiff filed a response (Docket Nos. 29, 30), to which Defendants replied

(Docket No. 31).[4] This matter is ripe for judgment.

## I. MOTION TO DISMISS STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency

of a complaint. It does not resolve issues of fact, merit, or the availability of various defenses.

*See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (*citing* 5A Charles A.

Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a

motion to dismiss for failure to state a claim, a plaintiff's well-pleaded complaint is taken as true

and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs, Inc. v.*

*Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the

claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) (second alteration in original) (*quoting Conley v. Gibson*, 355 U.S. 41, 47

(1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to

state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of [a] claim which would entitle him [or her] to relief." *Conley*, 355 U.S. at 45–46. In *Bell*

*Atlantic Corp.*, the Supreme Court noted that the complaint need not assert "detailed factual

allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of

the elements of a cause of action." *Bell Atl. Corp.*, 550 U.S. at 555 (citations omitted). Thus the

---

[4] Plaintiff filed an objection to Defendants' reply. (Docket No. 33.) By Memorandum Order entered on May 6, 2011, the Court informed Plaintiff that it would not consider Plaintiff's objection because it did not comply with the local rules. (Docket No. 39.)

"[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than "conceivable." *Id.* Therefore, in order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (*citing Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

Lastly, while the Court liberally construes *pro se* complaints, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it does not act as the inmate's advocate, *sua sponte* developing statutory and constitutional claims the inmate failed to clearly raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

## II. SUMMARY OF PLAINTIFF'S CLAIMS

Plaintiff makes eleven claims. Only Claims Six, Seven, and Eight are relevant to the Defendants who filed the motion to dismiss.

Claim One:     Defendant Maryland denied and delayed Plaintiff's immediate medical care by failing to file an incident report and failing to transport Plaintiff to the medical ward. (Compl. ¶ 103.)

Claim Two:     Defendant Moody denied and delayed Plaintiff's immediate medical care by failing to file an incident report and failing to transport Plaintiff to the medical ward. (Compl. ¶ 104.)

Claim Three:   Defendant Brown denied and delayed Plaintiff's immediate medical care by failing to file an incident report and failing to provide prompt medical attention. (Compl. ¶ 105.)

Claim Four:    Defendant Carpino failed to investigate properly the incident stemming from Defendants Maryland, Moody, and Brown's failure to file an incident

report; refused Plaintiff's medical treatment; and delayed Plaintiff's medical care. (Compl. ¶ 106.)

Claim Five:  Defendant Hinkle denied and delayed Plaintiff's medical care. (Compl. ¶ 107.)

Claim Six:  Defendant Underdue denied Plaintiff's medical treatment. (Compl. ¶ 108.)

Claim Seven:  Defendants PHS, Jane Doe 1, and Jane Doe 2 failed to provide Plaintiff prompt medical attention. (Compl. ¶ 109.)

Claim Eight:  Defendant King denied Plaintiff medical treatment. (Compl. ¶ 110.)

Claim Nine:  Defendant Alderman denied and delayed Plaintiff's medical care. (Compl. ¶ 111.)

Claim Ten:  Defendant Scott violated Plaintiff's due process rights by failing to prepare and file an incident report. (Compl. ¶ 112.)

Claim Eleven: Defendant Schilling denied and delayed Plaintiff's medical care. (Compl. ¶ 113.)

Plaintiff seeks a preliminary and permanent injunction allowing him a permanent "bottom bunk pass" for the duration of his incarceration. (Compl. 24.)  Plaintiff also seeks an award of $300,000 from each of the thirteen defendants.[5]  (Compl. 24–25.)

### III. SUMMARY OF FACTS

On October 21, 2008, Plaintiff arrived at Greensville Correctional Center ("GCC") from another facility. (Compl. ¶ 20.)  The medical department did not examine Plaintiff as a new arrival. (Compl. ¶ 20.)

---

[5] Although Plaintiff names the Virginia Department of Corrections as a defendant (Compl. ¶ 10), Plaintiff does not list that entity in his claims or in his prayer for relief.

4

### A.      February 2, 2009 at 1:15 a.m.:  Plaintiff's First Episode

On February 2, 2009, at approximately 1:15 a.m., Plaintiff awoke and realized that he was about to have "Seizure/Blackout." (Compl. ¶ 22.) Plaintiff, who was assigned to the top bunk, attempted to descend from the top bunk before he lost consciousness. (Compl. ¶¶ 21–22.) While he was descending, Plaintiff "blackout/lose conscious and fell to the floor." (Compl. ¶ 23.) Plaintiff struck his right leg below the knee on a metal stool and scraped the top of his head against the edge of the toilet. (Compl. ¶¶ 23–24.) Plaintiff's face hit the concrete floor, splitting his lip. (Compl. ¶ 24.) Plaintiff laid unconscious on the floor. (Compl. ¶ 24.)

When this occurred, Plaintiff's cellmate, Michael Anderson, woke up from the noise and found Plaintiff lying face down on the floor, bleeding from the mouth. (Compl. ¶¶ 25–26.) Plaintiff's body was shaking. (Compl. ¶ 25.) Anderson called out Plaintiff's name and one of the midnight-shift guards came to the cell. (Compl. ¶ 26.) The guard saw Plaintiff lying face down on the floor and bleeding from the mouth. (Compl. ¶ 26.)

Approximately five or ten minutes later, Plaintiff gained consciousness but remained disoriented. (Compl. ¶ 27.) Plaintiff did not realize that he had fallen from the top bunk and was lying on the floor, bleeding from his mouth. (Compl. ¶ 27.) While Plaintiff was regaining consciousness, Officer Maryland looked into the cell and saw blood on the floor. (Compl. ¶ 28.) Officer Maryland left to put on a pair of protective gloves. (Compl. ¶ 28.) Plaintiff started cleaning up the blood off the floor and toilet. (Compl. ¶ 29.) Officer Maryland never returned to Plaintiff's cell. (Compl. ¶ 53(1).)[6]

---

[6] Plaintiff's complaint includes two paragraphs labeled paragraph 53.  For purposes of this Memorandum Opinion, the Court will call the first "53(1)" and the second "53(2)."

Ten minutes after Officer Maryland left the cell door, Officer Moody arrived and asked Plaintiff about his head. (Compl. ¶ 30.) Plaintiff explained to Moody what had occurred and showed her his cut lip. (Compl. ¶ 30.) Moody informed Plaintiff that a nurse was on the way.[7] (Compl. ¶ 30.) Officer Moody left and never returned to the cell. (Compl. ¶ 53(2).)

Ten or fifteen minutes after Officer Moody left the cell door, Lieutenant Brown arrived and entered the cell. (Compl. ¶ 31.) Lieutenant Brown asked Plaintiff what had occurred, and Plaintiff explained what had occurred. (Compl. ¶ 31.) Plaintiff showed his bleeding lip to Brown. (Compl. ¶ 31.) Brown appeared not to believe Plaintiff's story and asked whether Plaintiff and Anderson had gotten into a fight. (Compl. ¶ 32.) Both Plaintiff and Anderson assured Brown that they had not been fighting. (Compl. ¶ 32.) Brown left the cell without showing concern for Plaintiff's medical needs. (Compl. ¶ 34.) Brown never returned to Plaintiff's cell. (Compl. ¶ 54.)

Plaintiff and Anderson remained awake as long as they could waiting on a nurse to arrive. (Compl. ¶ 35.) Nobody from the medical staff came to attend to Plaintiff's injuries. (Compl. ¶ 35.)

## B.     February 2, 2009 at 6:45 a.m.: Plaintiff's Second Episode

A few hours after this incident occurred—at approximately 6:45 a.m.—Plaintiff was standing in line to receive his breakfast. (Compl. ¶ 38.) Plaintiff felt another "seizure/blackout" about to occur. (Compl. ¶ 38.) Plaintiff stepped out of the serving line and approached

---

[7] This is the conduct, along with other assertions that the medical department was alerted to Plaintiff's situation, which Plaintiff suggests gives rise to his complaint against Nurses Jane Doe 1 and Jane Doe 2. (Compl. ¶¶ 55, 56, 58.)

Lieutenant Medlin.[8]  (Compl. ¶ 38.)  Plaintiff informed Medlin what had taken place earlier in the night.  (Compl. ¶ 38.)  Plaintiff asked Medlin if he could get a cup from the front of the line so he could get some water because he was not feeling well.  (Compl. ¶ 38.)  Medlin stated that she was aware of what had happened earlier in the morning, and permitted Plaintiff to get a cup of water.  (Compl. ¶ 38.)

Plaintiff then asked Medlin if Plaintiff could step outside for fresh air.  (Compl. ¶ 39.)  As Plaintiff was going out the door to get fresh air, he felt another "seizure/blackout" about to commence.  (Compl. ¶ 40.)  Plaintiff kneeled down on the sidewalk.  (Compl. ¶ 40.)  Lieutenant Scott approached Plaintiff and asked him if he was all right.  (Compl. ¶ 40.)  Plaintiff responded, "No."  (Compl. ¶ 40.)  Plaintiff then started his second "seizure/blackout."  (Compl. ¶ 40.)  Lieutenant Scott and an inmate carried Plaintiff to the medical department.  (Compl. ¶ 40.)

While Lieutenant Scott and the inmate were carrying Plaintiff to the medical department, Plaintiff's body was shaking and then went limp.  (Compl. ¶ 41.)  Plaintiff blacked out.  (Compl. ¶ 41.)  Plaintiff scraped his knuckles and knee when this happened.  (Compl. ¶ 42.)

Plaintiff began regaining consciousness as he entered the medical unit.  (Compl. ¶ 43.)  Plaintiff sat down and Lieutenant Scott asked Plaintiff if he had the flu.  (Compl. ¶ 43.)  Plaintiff informed Lieutenant Scott that he did not have the flu.  (Compl. ¶ 43.)  Plaintiff explained that he had a "seizure/blackout" the night before, but that nobody did anything about it.  (Compl. ¶ 44.)  Nurse Taylor scheduled Plaintiff to see the doctor later that afternoon.  (Compl. ¶ 45.)

---

[8]  Lieutenant Medlin is not a party to this action.

### C.      February 2, 2009 at 2:00 p.m.:  Dr. King Treats Plaintiff

Later that afternoon, at approximately 2:00 p.m. on February 2, 2009, Plaintiff was called

to report to the medical department.  (Compl. ¶ 46.)  Plaintiff reported to Dr. King.  (Compl.

¶ 46.)  Dr. King scheduled Plaintiff to see a neurologist and to take several other tests.  (Compl.

¶ 46.)  Dr. King asked Plaintiff how long Plaintiff had been experiencing "seizures/blackouts."

(Compl. ¶ 46.)  Plaintiff informed Dr. King that he had been having the episodes all of his life

since he was a child.  (Compl. ¶ 46.)  Plaintiff explained to Dr. King that he used to go to St.

Mary's hospital and the Medical College of Virginia ("MCV") in Richmond, Virginia.  (Compl.

¶ 46.)  Dr. King issued Plaintiff a six-month  "bottom bunk pass."  (Compl. ¶ 46.)

### D.      February 11, 2009:  Plaintiff's Informal Grievance

On February 11, 2009, Plaintiff filed an informal complaint regarding the February 2,

2009, 1:15 a.m. episode.  (Compl. ¶ 73.)  Lieutenant Brown was assigned to respond to the

informal complaint by February 26, 2009.  (Compl. ¶ 74.)  On February 17, 2009, Unit Manager

Carpino asked Plaintiff what occurred on February 2, 2009.  (Compl. ¶ 59.)  Plaintiff explained

what happened.  (Compl. ¶ 59.)  Plaintiff also informed Carpino that Plaintiff had experienced

the episodes his entire life.  (Compl. ¶ 59.)  Later, Carpino called Plaintiff into his office to speak

with Plaintiff regarding the informal complaint Plaintiff filed.  (Compl. ¶ 60.)  Carpino asked if

Plaintiff got into a fight with his cellmate, Anderson.  (Compl. ¶ 60.)  Carpino informed Plaintiff

that Anderson was known to be a "cell-bully."  (Compl. ¶ 60.)  Plaintiff assured Carpino that

Plaintiff and Anderson did not get into a fight.  (Compl. ¶ 60.)  Plaintiff explained that his

"seizure/blackout" caused his injuries.  (Compl. ¶ 60.)

### E.  February and March 2009:  Plaintiff's Regular Grievances

Lieutenant Brown did not respond to Plaintiff's February 11, 2009 informal complaint. (Compl. ¶ 75.) Accordingly, on February 27, 2009, Plaintiff filed two regular grievances:  One for denying medical care and one for delaying medical care. (Compl. ¶ 76.)  The regular grievance regarding delayed medical care was accepted by the grievance department while the grievance pertaining to denying medical care was rejected as repetitive.  (Compl. ¶¶ 77–78.)

On March 5, 2009, Plaintiff appealed the rejection of his regular grievance which complained of the denial of medical care. (Compl. ¶ 80.)  On March 30, 2009, Assistant Warden Alderman returned Plaintiff's regular grievance.  (Compl. ¶ 82.)  It was returned "founded." (Compl. ¶ 82.)

### F.  April 2009:  Plaintiff's Level II Grievance

On April 3, 2009, Plaintiff filed a Level II grievance with Health Services Director Schilling.  (Compl. ¶ 83.)  On April 10, 2009, Schilling answered Plaintiff's Level II grievance. (Compl. ¶ 84.)  Schilling agreed with the Level I response and determined that Plaintiff's grievance was "founded." (Compl. ¶ 87.)  Nether the Level I nor the Level II response addressed Plaintiff's request for compensation for his physical, mental, and emotional injuries.  (Compl. ¶ 84.)

### G.     June 6, 2009: Dr. King Treats Plaintiff

Four months after the original incident, on June 6, 2009,[9] Dr. King saw Plaintiff because Plaintiff was having daily symptoms of the "seizures/blackouts."[10] (Compl. ¶¶ 47, 70.) Dr. King denied Plaintiff a CAT scan. (Compl. ¶ 47.) Plaintiff asked Dr. King when he would be able to see a neurologist. (Compl. ¶ 47.) Dr. King said, "You haven't seen a [n]eurologist yet?" (Compl. ¶ 47.) When Plaintiff told Dr. King that he had not, Dr. King informed Plaintiff that he would not be seen by a neurologist. (Compl. ¶ 47.) Plaintiff asked Dr. King to reschedule an appointment with the neurologist because it had been four months since Dr. King first told Plaintiff he would send Plaintiff to the neurologist. (Compl. ¶ 47.) Dr. King felt that Plaintiff needed to experience another "seizure/blackout" to further his prognosis. (Compl. ¶ 48.) Plaintiff contends that a future episode would put his life in danger because he is in "an environment that breeds violence." (Compl. ¶ 70.)

### H.     June and July 2009: Grievance Procedure Regarding Dr. King

On June 11, 2009, Plaintiff filed an informal complaint on Dr. King for refusing to review Plaintiff's complete medical file, refusing to refer Plaintiff to a neurologist, and refusing to schedule a CAT scan for Plaintiff. (Compl. ¶ 86.) On June 15, 2009, Plaintiff's informal grievance was accepted and assigned to Nurse Underdue. (Compl. ¶ 87.) On June 23, 2009, Nurse Underdue responded to Plaintiff's informal complaint, indicating that since Plaintiff's

---

[9] Plaintiff also asserts that an examination took place on June 11, 2009. (Compl. ¶¶ 70–71.) It is unclear whether these were separate examinations.

[10] Plaintiff explains that, three to four times each week he would "feel[] the episodes coming on," but he would not actually black out. (Compl. ¶ 70.)

arrival at GCC, he has had no documented blackouts. (Compl. ¶¶ 57, 88, 89; Ex. E.) Nurse Underdue informed Plaintiff that he had been referred to a neurologist. (Compl. Ex. E.)

On July 1, 2009, Plaintiff filed a regular grievance regarding Dr. King and Nurse Underdue. (Compl. ¶ 90; Ex. F.) On July 22, 2009, Assistant Warden Alderman responded to the regular grievance, and determined that the grievance was unfounded. (Compl. ¶ 92; Ex. G.)

On July 22, 2009, Plaintiff filed a Level II grievance to the Office of Health Services. (Compl. ¶ 93.) On July 29, 2009, Health Services Director Schilling responded to Plaintiff's grievance. (Compl. ¶ 94; Ex. H.) Schilling concurred with the Level I response and ruled the grievance unfounded. (Compl. ¶ 94; Ex. H.)

### I.  August 2009:  Dr. Ellis Treats Plaintiff

In August 2009, Plaintiff was called to the medical department to see Dr. Ellis[11] regarding his episodes. (Compl. ¶ 49.) Dr. Ellis reviewed Plaintiff's medical file and requested stool samples from Plaintiff. (Compl. ¶ 49.) Dr. Ellis prescribed Plaintiff iron pills and renewed Plaintiff's bottom-bunk pass for another six months. (Compl. ¶ 49.) Neither Dr. Ellis nor Dr. King know what causes Plaintiff's episodes, and they do not know what to prescribe for them. (Compl. ¶ 50.)

## IV. ANALYSIS

### A.  Claim Eight:  Dr. King's Alleged Liability

In Claim Eight, Plaintiff alleges that Dr. King denied Plaintiff medical treatment. (Compl. ¶ 110.) Plaintiff complains about the following issues:  (1) Dr. King's recommendation that waiting for another episode to occur would help him determine the ailment's prognosis,

---

[11] Dr. Ellis is not a party to this action.

(2) Dr. King's refusal to refer Plaintiff to a neurologist, and (3) Dr. King's refusal to schedule Plaintiff for a CAT scan.  (Compl. Ex. E.)

### 1.     Eighth Amendment Standard

In order to state an Eighth Amendment claim, a plaintiff must allege facts that suggest: (1) that objectively the deprivation suffered or harm inflicted was "'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (*quoting Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  With respect to the denial of adequate medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

A medical need is "serious" if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (*quoting Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008) (*citing Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

In the context of an allegation of cruel and unusual punishment as a result of delayed medical care, the objective-prong analysis does not end there.  In addition to alleging that the medical need was objectively serious, Plaintiff must plausibly allege facts indicating that the delay in the provision of medical care "'resulted in substantial harm.'"  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (*quoting Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *id.* at 754 (*quoting Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (identifying this additional requirement of the objective prong); *see Webb*, 281 F. App'x at 166–67 n.13

(explaining that where an Eighth Amendment claim is predicated on a delay in the provision of medical care, the plaintiff must demonstrate "'that the delay resulted in substantial harm.'" (*quoting Sealock*, 218 F.3d at 1210)). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citing cases); *see Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (*quoting Monmouth Cnty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

Regarding the second, subjective prong, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (*citing Estelle*, 429 U.S. at 105–06); *see Davis v. Stanford*, 382 F. Supp. 2d 814, 820 (E.D. Va. 2004), *aff'd*, 127 F. App'x 680 (4th Cir. 2005) ("[A]n assertion of mere negligence or malpractice is not enough to constitute an Eighth Amendment violation." (citations omitted)). Deliberate indifference requires the plaintiff to allege facts that suggest that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Furthermore, absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less demonstrate deliberate indifference.[12] *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (*citing Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, in evaluating a prisoner's complaint

---

[12] The mere fact that some level of treatment was rendered, however, does not preclude a finding that an official acted with deliberate indifference. A plaintiff may also prove deliberate indifference by introducing evidence that a defendant recklessly refused or delayed in providing a plaintiff with access to medical care. *Estelle*, 429 U.S. at 104–05 & n.11 (citing seven such cases); *Oxendine*, 241 F.3d at 1277–79 (concluding prison doctor's obviously ineffectual efforts to attach the plaintiff's severed finger could support an inference of deliberate indifference).

regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (*citing Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

### 2.   Plaintiff's Allegations

When ruling on a motion to dismiss, the Court must assume the truth of Plaintiff's factual assertions and view the complaint in the light most favorable to Plaintiff. *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Even assuming the truth of Plaintiff's complaint, Plaintiff's factual allegations do not plausibly suggest that Dr. King has exhibited deliberate indifference to a serious medical need. To the contrary, Plaintiff's allegations establish that Dr. King evaluated Plaintiff's medical condition and provided care on two separate occasions.

Dr. King examined Plaintiff on the very day that Plaintiff complained about having these mysterious "seizures/blackouts" on February 2, 2009. At that time, King scheduled Plaintiff to see a neurologist and "to take several other tests." (Compl. ¶ 46.) King gave Plaintiff a bottom-bunk pass. (Compl. ¶ 46.) Plaintiff does not complain that Dr. King's February 2, 2009 treatment amounted to deliberate indifference.

Instead, Plaintiff's allegations surround the later, June 6, 2009 visit. That visit was prompted by Plaintiff experiencing symptoms of the episodes, or he would feel them "coming on." (Compl. ¶¶ 47, 70.) Plaintiff, however, had not experienced another "seizure/blackout." (Compl. ¶ 70.) When the symptoms occurred, Dr. King evaluated Plaintiff. Dr. King did not

14

know what could be causing Plaintiff's ailment.[13]  (Compl. ¶ 50.)  Nevertheless, there was no

indication that Plaintiff had been injured or actually experienced a seizure since February 2,

2009.  Accordingly, Dr. King informed Plaintiff that it would assist his diagnosis of the ailment

if Plaintiff waited until another episode occurred.[14]

### 3.    Dr. King's Decision to Wait for Another Occurrence

Plaintiff seems to allege that Dr. King should have tended to Plaintiff's medical needs

immediately instead of waiting to monitor Plaintiff's progress.  Plaintiff explains that if Plaintiff

waits until he experiences another "seizure/blackout," then he might be subject to violence while

incapacitated among violent offenders.  Plaintiff's allegations state that he experienced one

episode between 1989 and 1992 and another which occurred between 2000 and 2001.  (Compl.

Ex. A2, at 2.)  Given the rarity of these episodes and the relatively minor scrapes and bruises

Plaintiff has experienced, Plaintiff's allegation of future violent harm is entirely speculative.

For a claim of nontreatment to constitute deliberate indifference, it "must be so grossly

incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to

fundamental fairness."  *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).  An Eighth

Amendment claim may survive a motion to dismiss based on a defendant's conduct in exposing

---

[13] Although Plaintiff alleges that he has experienced the "seizures/blackouts" periodically throughout his whole life, Plaintiff does not suggest any of his previous physicians have been able to diagnose the cause of his problems.

[14] It is unclear what harm Plaintiff is complaining about.  In his complaint, Plaintiff focuses on the collateral physical effects of his "seizures/blackouts." For example, in the paragraph listing his injuries, Plaintiff mentions a bruised leg, a swollen and split lip, and scrapes on his knuckles.  (Compl. ¶ 67.)  Plaintiff further states, "The injuries sustained by the [P]laintiff, lasted for several weeks, which resulted to a dark spot on the outside of the [P]laintiff's bottom lip."  (Compl. ¶ 67.)  In Plaintiff's response to the motion to dismiss, however, Plaintiff focuses on the seriousness of head injuries in general.  (Resp. Mot. Dismiss ¶¶ 39–40.)

an inmate to an unreasonable risk of *future* harm. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993). "To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must . . . give rise to 'sufficiently *imminent* dangers.'" *Baze v. Rees*, 553 U.S. 35, 49–50 (2008) (*quoting Helling*, 509 U.S. at 34). This causal relationship must be "'*sure or very likely*'" to occur. *Id.* at 50 (*quoting Helling*, 509 U.S. at 33). A doctor's negligence or even malpractice does not constitute a § 1983 claim. *Wright*, 766 F.2d at 849; *Grayson*, 195 F.3d at 695.

In this case, Plaintiff asserts that Dr. King has exposed Plaintiff to an unreasonable risk of serious damage to his future health by choosing to monitor Plaintiff's progress instead of taking some other course of action. This exposure, if it exists at all, is neither sure nor very likely—based on Plaintiff's allegations—to cause an imminent, dangerous risk of future harm. Moreover, Plaintiff fails to allege facts which plausibly indicate that the delay substantially harmed his treatment for the episodes. *Wood v. Housewright*, 900 F.2d 1332, 1333, 1335 (9th Cir. 1990) (holding that a delay of "several days" in fixing a broken pin his shoulder did not substantially harm Plaintiff's treatment, "considering that the only remedy immediately available was a prescription for painkillers"). Plaintiff's failure to allege facts which plausibly indicate that any delay in treatment caused him substantial harm does not allow the Court to draw the reasonable inference that the Defendants are liable for the alleged misconduct. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

The finding that Dr. King's decision did not place Plaintiff at risk of any substantial harm is supported by the fact that Plaintiff has not suffered any medical malady attributable to Dr. King's actions or inactions in the more than two years since Plaintiff first saw Dr. King. *Shabazz*

*v. GEO*, No. 3:07CV784, 2008 WL 2674029, at *1 (E.D. Va. July 7, 2008).  At the time of Dr.

King's decision to wait, Plaintiff had not experienced a "seizure/blackout" in four months, and

Dr. King did not know what was wrong with Plaintiff.  Plaintiff does not allege that his condition

was deteriorating—indeed, according to Plaintiff, he has been experiencing these symptoms

since he was a child—"or that the delay in medical care would cause him substantial pain."

*Nelson v. Hill*, No. 3:08cv603–HEH, 2011 WL 2358542, at *4 (E.D. Va. June 9, 2011).

Dr. King evaluated Plaintiff and determined that his condition did not warrant further

medical intervention.  A doctor's medical decision to refrain from treatment or invasive

procedures, absent an allegation that the doctor's omissions are "sufficiently harmful to evidence

deliberate indifference to serious medical needs" does not raise a § 1983 claim.  *Fitzgerald v.

Corr. Corp. Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005) (*quoting Estelle*, 429 U.S. at 106)

(holding that a doctor's recommendation, after thorough evaluation, to "do nothing" after an

inmate has a seizure and injures himself falling cannot give rise to an Eighth Amendment claim

because the doctor was not indifferent to the inmate's medical needs);  *McCoy v. Goord*, 255 F.

Supp. 2d 233, 260 (S.D.N.Y. 2003) (granting a motion to dismiss on the basis that, *inter alia*, the

inmate did not allege how he was harmed when medical staff kept the defendant "waiting for

twenty-five minutes and then sent him back to his cell without treating his chest pains").

In order for Plaintiff to state a claim for deliberate indifference, he must be able to show

that Dr. King  "'refused to treat him, ignored his complaints, intentionally treated him

incorrectly, or engaged in any similar conduct.'" *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir.

2006) (*quoting Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

Plaintiff's allegation regarding Dr. King's medical judgment and his decision to wait for Plaintiff

to experience another episode does not rise to a level of deliberate indifference. *Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975) ("[N]on-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim under § 1983." (*citing Gittlemacker*, 428 F.2d at 6)); *id.* at 319 ("Questions of medical judgment are not subject to judicial review."). Accordingly, this claim will be DISMISSED.

### 4.    Dr. King's Refusal to Send Plaintiff to a Neurologist and Refusal to Provide a CAT Scan

Plaintiff complains that he requested a neurologist and requested a CAT scan, but Dr. King decided not to provide them. An inmate's disagreement with his doctor regarding proper medical care does not state a § 1983 claim. *Wright*, 766 F.2d at 849. In this case, Dr. King—as well as Dr. Ellis—provided Plaintiff with medical care on multiple occasions. *Id.* Although Dr. King recommended on February 2, 2009 that Plaintiff visit a neurologist, for reasons which Plaintiff does not explain, Plaintiff never saw the neurologist.[15] When this information came to Dr. King's attention four months later, Dr. King made the medical determination that Plaintiff no longer needed to visit the neurologist. This sort of medical decision is beyond the scope of judicial review. *Russell*, 528 F.2d at 319; *see Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) ("Matters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing." (*citing Ledoux v. Davies*, 931 F.2d 1536, 1537 (10th Cir. 1992))); *Gobert*, 463 F.3d at 346 ("'[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment.'" (*quoting Domino*, 239 F.3d at 756 (internal quotation marks omitted))). There are no allegations that Dr.

---

[15]  Plaintiff contends that, as of March 2011, he still has not seen the neurologist. (Resp. Mot. Dismiss ¶ 41.)

King's decision was "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.  Accordingly, Claim Eight will be DISMISSED.

### B.    Claim Six: Nurse Underdue's Alleged Liability

Claim Six involves the allegation that Defendant Nurse Underdue exhibited deliberate indifference to Plaintiff's health by denying him medical care. (Compl. ¶ 108.)  Plaintiff's complaint indicates that the extent of Nurse Underdue's involvement with Plaintiff's situation was in the capacity of responding to an informal grievance.

Specifically, Plaintiff's June 15, 2009 informal grievance was assigned to Nurse Underdue. (Compl. ¶ 87.)  That grievance complained about Dr. King's assertion that if Plaintiff experienced another "seizure/blackout" episode, it would assist him in his prognosis. (Compl. Ex. E.)  Plaintiff complained that Dr. King refused to review Plaintiff's complete medical file or the history of Plaintiff's episodes. (Compl. Ex. E.)  Finally, Plaintiff grieved that Dr. King refuses to refer Plaintiff to a neurologist or schedule Plaintiff for a CAT scan. (Compl. Ex. E.)

On June 23, 2009, Nurse Underdue responded to Plaintiff's informal complaint, indicating to Plaintiff that since Plaintiff's arrival at GCC, he has had no documented blackouts. (Compl. ¶¶ 57, 88, 89; Ex. E.)  Despite this, Nurse Underdue informed Plaintiff that he had been referred to a neurologist. (Compl. Ex. E.)  According to Plaintiff, Underdue must not have reviewed Plaintiff's medical records because Plaintiff had experienced two of the episodes. (Compl. ¶ 57.)

Plaintiff's scant allegations against Underdue warrant dismissal.  Plaintiff does not allege that Nurse Underdue was responsible for treating Plaintiff or for evaluating his medical conditions.  To the contrary, Nurse Underdue merely responded to an informal grievance.  This

19

limited role does not expose Nurse Underdue to liability.[16] *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."). Accordingly, Claim Six will be DISMISSED.

### C.    Claim Seven: PHS's Alleged Liability

In Claim Seven, Plaintiff alleges that PHS failed to provide Plaintiff prompt medical attention. (Compl. ¶ 109.) "[T]he principles of § 1983 municipal liability . . . apply equally to a private corporation" when the plaintiff sues the corporation under 42 U.S.C. § 1983. *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003) (alteration and omission in original) (*quoting Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999)). A private corporation, such as PHS, "is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Austin*, 195 F.3d at 728 (citing cases). Plaintiff has not alleged any policy or custom of PHS which caused the violation of Plaintiff's federal rights. Furthermore, because Plaintiff has not sufficiently alleged that any employee of PHS violated his Eighth Amendment rights, Plaintiff's claim against PHS must be dismissed.[17] *Young v. City of Mt. Ranier*, 238 F.3d 567, 579 (4th Cir. 2001) ("'As there are no

---

[16] It is possible that an individual tasked with responding to prisoners' complaints could be found deliberately indifferent. For example, if she "routinely sent each grievance to the shredder without reading it, that might be a ground of liability." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (*citing Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005); *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)). Or perhaps she could be liable if she "intervened to prevent the medical unit from delivering needed care." *Id.* (*citing Hernandez v. Keane*, 341 F.3d 137 (2d Cir. 2003); *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004)); *see also George*, 507 F.3d at 609–10 ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not."). Plaintiff does not allege any such extreme conduct by Nurse Underdue.

[17] In his response to the motion to dismiss, Plaintiff attempts to raise a "failure to train" cause of action on the theory that PHS failed to adequately train and supervise Dr. King and

underlying constitutional violations by any individual, there can be no municipal liability.'" (*quoting Grayson*, 195 F.3d at 697)). Accordingly, Claim Seven as it relates to PHS[18] will be DISMISSED.

## V. CONCLUSION

For the above reasons, the Court will GRANT Defendants' motion to dismiss. (Docket No. 18.) Claims Six and Eight will be DISMISSED. Claim Seven, to the extent it implicates PHS, will be DISMISSED.

By Memorandum Order entered on February 22, 2011, the Court ordered Plaintiff to serve all defendants within one hundred and twenty (120) days from the date of entry thereof. Plaintiff's time for serving all defendants expired on June 22, 2011. Plaintiff will be DIRECTED to show good cause, within eleven (11) days from the date of entry hereof, why his claims against Jane Doe 1, Jane Doe 2, and Officer Moody should not be dismissed without prejudice for failure to serve in accordance with Federal Rule of Civil Procedure 4(m). Failure to show good cause within eleven (11) days of the date of entry hereof will result in dismissal of his claims against those defendants without prejudice.

An appropriate Order will accompany this Memorandum Opinion.

Date: 8/9/11
Richmond, Virginia

/s/
James R. Spencer
Chief United States District Judge

---

Nurse Underdue. In the absence of a constitutional violation on the part of the employees being supervised, however, there can be no liability under § 1983 on the part of the employer. *Huggins v. Weider*, 105 F. App'x 503, 505–06 (4th Cir. 2004); *Young*, 238 F.3d at 579.

[18] Claim Seven also alleges liability of Jane Doe 1 and Jane Doe 2.