IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**MUWAKKIL SEIFULLAH BEY SHABAZZ,**

　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　Civil Action No. **3:10CV190**

**PRISON HEALTH SERVICES, INC.,** *et al.,*

　　　　Defendants.

## MEMORANDUM OPINION

　　Muwakkil Seifullah Bey Shabazz, a Virginia prisoner proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983.

## I. PROCEDURAL HISTORY

　　Shabazz asserts a violation of the Eighth Amendment[1] in that prison officials[2] denied or delayed adequate medical care. Shabazz originally made eleven claims for relief. The Memorandum Opinions and Orders of August 9, 2011 and September 1, 2011 dismissed Claims Six, Seven, and Eight. Claim Two names only Defendant Moody, who was dismissed pursuant

---

[1] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[2] Shabazz sued Prison Health Services, Inc. ("PHS"); Dr. Toney King; Head Nurse Underdue; Nurse Jane Doe 1; Nurse Jane Doe 2; the Virginia Department of Corrections; Health Services Director Fred Schilling; Chief Warden George Hinkle; Assistant Warden Alderman; Unit Manager Carpino; Lieutenant Brown; Officer Moody; Officer Maryland; and Lieutenant Scott. Respondent refers to Nurse Underdue as "Nurse Terry." On August 9, 2011, by Memorandum Opinion and Order, the Court granted a motion to dismiss filed by Defendants PHS, Dr. Toney King, and Head Nurse Underdue. *Shabazz v. Prison Health Servs., Inc.*, No. 3:10CV190, 2011 WL 3489661, at *11 (E.D. Va. Aug. 9, 2011). On September 1, 2011, by Memorandum Opinion and Order, the Court terminated Jane Doe 1, Jane Doe 2, and Officer Moody as defendants in this action. (Docket Nos. 55, 56.)

to the September 1, 2011 Memorandum Opinion and Order due to Shabazz's failure to effect

service. Accordingly, Claim Two will be DISMISSED WITHOUT PREJUDICE.

The following claims survive:[3]

Claim One:        Defendant Maryland was deliberately indifferent to Shabazz's serious medical need when Maryland failed to file an incident report and failed to transport Shabazz to medical. (Compl. ¶ 103.)

Claim Three:      Defendant Brown was deliberately indifferent to Shabazz's serious medical need when Brown failed to file an incident report and delayed Shabazz's medical care. (*Id.* ¶ 105.)

Claim Four:       Defendant Carpino was deliberately indifferent to Shabazz's serious medical need when Carpino failed to investigate the failure of Defendants Maryland, Moody, and Brown to file an incident report and when Carpino refused and delayed Shabazz's medical treatment. (*Id.* ¶ 106.)

Claim Five:       Defendant Hinkle was deliberately indifferent to Shabazz's serious medical need when Hinkle denied and delayed Shabazz's medical care. (*Id.* ¶ 107.)

Claim Nine:       Defendant Alderman was deliberately indifferent to Shabazz's serious medical need when he denied and delayed Shabazz's medical care. (*Id.* ¶ 111.)

Claim Ten:        Defendant Scott was deliberately indifferent to Shabazz's serious medical need when Scott failed to prepare and file an incident report. (*Id.* ¶ 112.)

---

[3] Shabazz, in every claim except Claim Ten, asserts that a defendant was deliberately indifferent to his serious medical need in violation of both his Eighth and Fourteenth Amendment rights. (Compl. ¶¶ 103, 105, 106, 107, 111, 113.) In Claim Ten, Shabazz states that "Defendant Scott, Violated the plaintiff's rights under the Due Process as applicable to the deliberate indifference of the Fourteenth Amendment . . . ." (*Id.* ¶ 112.) "[I]t is now well established that the Eighth Amendment 'serves as the primary source of substantive protection to convicted prisoners,' and the Due Process Clause affords a prisoner no greater *substantive* protection 'than does the Cruel and Unusual Punishments Clause.'" *Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir. 1996) (*quoting Whitley v. Albers*, 475 U.S. 312, 327 (1986)). Thus, Shabazz's Fourteenth Amendment due process claims are subsumed within his Eighth Amendment claims. *Id.*

Claim Eleven:          Defendant Schilling was deliberately indifferent to
                       Shabazz's serious medical need when he denied and
                       delayed Shabazz's medical care. (*Id.* ¶ 113.)

Shabazz seeks a preliminary and permanent injunction allowing him a permanent bottom bunk

pass for the duration of his incarceration and an award of $300,000 from each defendant.

(Compl. 24–25.)  This matter is now before the Court on a Motion for Summary Judgment filed

by the remaining defendants:  C. Alderman, R. Brown, Clark Carpino, George M. Hinkle,

Correctional Officer Maryland, Fred Schilling, Lieutenant Scott, and the Virginia Department of

Corrections (collectively "Defendants").  (Docket No. 41.)  Shabazz has responded.  (Docket

Nos. 45, 46, 47, 48.)  Defendants' Motion for Summary Judgment will be GRANTED and

Shabazz's remaining claims will be DISMISSED.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  It is the responsibility of the party seeking summary judgment to inform the

court of the basis for the motion, and to identify the parts of the record which demonstrate the

absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

issue, a summary judgment motion may properly be made in reliance solely on the pleadings,

depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation

marks omitted).  When the motion is properly supported, the nonmoving party must go beyond

the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and

3

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting* former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251. "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed." *Id.* (internal quotation marks omitted).

Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (*quoting Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n. 7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only cited materials . . . ."). Therefore, the Court's disposition of the Motion for Summary Judgment is based upon the materials Defendants submitted in support of their Motion for Summary Judgment and the materials Shabazz submitted in opposition to the Motion for Summary Judgment.

Defendants R. Brown, Clark Carpino, George M. Hinkle, Maryland, and Fred Schilling, submitted their own affidavits in support of Defendants' motion for summary judgment. (Defs. Mem. Supp. Mot. Summ. J. Attachs. 1–5; Carpino Aff. (Docket No. 44).) Shabazz submitted his sworn complaint (Compl. (Docket No. 1) 26), his own affidavit (Pl.'s Opp'n Mot. Summ. J. Ex. 1 ("Shabazz Aff.") (Docket No. 48-1)), and copies of his grievance forms (Compl. Exs. A–M).

4

In addition, Shabazz submitted unsworn documents (Docket Nos. 46, 48) that are not admissible evidence and, thus, will not be considered. Fed. R. Civ. P. 56(c)(4).

Of course, the facts offered by affidavit or sworn declaration must also be in the form of admissible evidence. *See id.* In this regard, the statement in the affidavit or sworn declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citation omitted) (*citing Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990); *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991)).

Several of Shabazz's statements in his complaint run afoul of these principles. For example, Shabazz relates the actions and statements of his cellmate, Michael Anderson, from a time when Shabazz himself was unconscious. (Compl. ¶¶ 24–27.) Shabazz also states that "Defendant Maryland witness[ed] the blood that was on the floor, which came from plaintiff's mouth." (*Id.* ¶ 28.) Because Shabazz has no personal knowledge of what Anderson did or said while he was unconscious or what Maryland perceived as she looked into his cell, these statements are inadmissible hearsay. *See* Fed. R. Evid. 602. In light of the foregoing principles, the following facts are established for the purposes of the motion for summary judgment.

### III. SUMMARY OF PERTINENT FACTS

On October 21, 2008, Shabazz transferred from Southampton Correctional Center to Greensville Correctional Center ("GCC"). (Compl. ¶ 20.) GCC personnel did not perform an intake medical examination on Shabazz, though he was seen in relation to his asthma. (*Id.*)

Shabazz claims that, "[at e]very prison I have been to, I have informed the nurse that I have seizure/blackout, ever[ ] since I was a child." (Shabazz Aff. ¶ 4.) GCC personnel assigned Shabazz to a cell and gave him the top bunk.

## A.  Shabazz's First Seizure

On February 2, 2009, at approximately 1:15 a.m., Shabazz awoke and realized that he was about to have "Seizure/Blackout." (*Id.* ¶ 22.) Recognizing his danger, Shabazz attempted to descend from the top bunk before he lost consciousness. (*Id.*) Unfortunately, Shabazz "blackout/lose conscious and fell to the floor" during his descent. (*Id.* ¶ 23.) During his fall, Shabazz struck his right leg below the knee on a metal stool and scraped the top of his head against the edge of the toilet. (*Id.* ¶¶ 23–24.) Shabazz's face hit the concrete floor, splitting his lip. (*Id.* ¶ 24.) Shabazz lay unconscious on the floor. (*Id.*)

Approximately five or ten minutes later, Shabazz regained consciousness but remained disoriented. (*Id.* ¶ 27.) Shabazz, unaware of his fall, was lying on the floor bleeding from his mouth. (*Id.* ¶¶ 27, 28) While Shabazz was regaining consciousness, Officer Maryland looked into the cell. (*Id.*) Officer Maryland then left and Shabazz started cleaning the blood off the floor and toilet. (*Id.* ¶ 29.) Officer Maryland never returned to Shabazz's cell.[4] (*Id.* ¶ 53(1).)[5] Ten minutes after Officer Maryland left the cell door, Officer Moody arrived and asked Shabazz about his head. (*Id.* ¶ 30.) Shabazz explained to Moody what had occurred and showed her his cut lip. (*Id.*) Officer Moody left and never returned to the cell. (*Id.* ¶ 53(2).)

---

[4] Maryland claims that she has no recollection of these events. (Defs. Mem. Supp. Mot. Summ. J. Ex. 1 ("Maryland Aff.") (Docket No. 42-1) ¶ 4.)

[5] Plaintiff's complaint includes two paragraphs labeled paragraph 53. For purposes of this Memorandum Opinion, the Court will call the first "53(1)" and the second "53(2)."

### 1.     Lieutenant Brown's Arrival - Shabazz's Version

Ten or fifteen minutes after Officer Moody left the cell door, Lieutenant Brown arrived

and entered the cell. (*Id.* ¶ 31.) Lieutenant Brown asked Shabazz what had occurred, and

Shabazz explained that he blacked out, fell off his bunk, and cut his lip. (*Id.*) Shabazz showed

his bleeding lip to Brown. (*Id.*) Brown, apparently not believing Shabazz's story, asked whether

Shabazz and his cellmate, Anderson, had gotten into a fight. (*Id.* ¶ 32.) Shabazz assured Brown

that he had not been fighting. (*Id.*) Brown left the cell without offering any medical assistance

and did not return. (*Id.* ¶¶ 34, 54.) Shabazz and his cellmate, Anderson, remained awake as long

as they could waiting on a nurse, but no medical personnel ever arrived. (*Id.* ¶ 35.)

### 2.     Lieutenant Brown's Arrival - Brown's Version

Brown avers that, upon his arrival at Shabazz's cell, Shabazz was seated on a stool next

to his desk. (Defs. Mem. Supp. Mot. Summ. J. Ex. 2 ("Brown Aff.") (Docket No. 42-2) ¶ 4.)

Brown asked Shabazz what had happened and Shabazz replied that "he felt a seizure coming on

so he'd gotten down off the top bunk and sat on the stool. [Shabazz] further claimed that during

his alleged seizure he'd hit his mouth on the toilet bowl and that he'd cleaned up the blood

before [Brown] arrived." (*Id.*) Brown then asked Shabazz if he needed to see medical. (*Id.*)

"[Shabazz] said no." (*Id.*) Brown left Shabazz's cell and went to medical where he discovered

that Shabazz had no history of seizures. (*Id.*) Brown then reported the incident to his Watch

Commander. (*Id.* ¶¶ 4–5.)

### B.     Shabazz's Second Seizure

A few hours after this incident occurred, at approximately 6:45 a.m. on February 2, 2009,

Shabazz was standing in line to receive his breakfast. (Compl. ¶ 38.) Feeling another

"seizure/blackout" about to occur, Shabazz stepped out of the serving line and approached

Lieutenant Medlin.[6]  (*Id.*)  Shabazz informed Medlin what had taken place earlier in the night and asked Medlin if he could get some water because he was not feeling well.  (*Id.*)  Medlin permitted Shabazz to get a cup of water.  (*Id.*)

Shabazz then asked Medlin if he could step outside for some fresh air.  (*Id.* ¶ 39.)  As Shabazz was going out the door to get fresh air, he felt another "seizure/blackout" about to commence, compelling him to kneel on the sidewalk.  (*Id.* ¶ 40.)  Lieutenant Scott approached Shabazz and asked him if he was all right to which Shabazz responded, "'No.'"  (*Id.*)  Shabazz then started his second "seizure/blackout."  (*Id.*)

As Lieutenant Scott and an inmate, Mikeel, carried Shabazz to the medical department, Shabazz's body "was shaking and then . . . went limp" as he blacked out.  (*Id.* ¶ 41.)  As a result of Shabazz going limp, all three men, Scott, Shabazz, and Mikeel, fell to the ground causing Shabazz to scrape his knuckles and right knee.  (*Id.* ¶ 42.)  Scott and Mikeel recovered and carried Shabazz to the nurse station.  (*Id.* ¶ 43.)  As he was being carried, Shabazz began to regain consciousness.  (*Id.*)  Once Shabazz was seated at medical, Scott inquired if Shabazz had the flu, to which Shabazz responded, "'No.'"  (*Id.*)  Shabazz explained to Scott that Shabazz had a "seizure/blackout" the night before, but had not seen any medical personnel.  (*Id.* ¶ 44.)  GCC personnel scheduled an appointment for Shabazz to see the doctor later that afternoon.  (*Id.* ¶ 45.)

**C.      Shabazz's Visits to Medical**

On the afternoon of February 2, 2009, Shabazz met with Dr. King at medical.  (*Id.* ¶ 46.)  Shabazz informed Dr. King that he "ha[d] been having these episodes (seizure/blackouts) all his . . . life, from a child, on up."  (*Id.*)  Shabazz asserts that, at the February 2, 2009 meeting, Dr. King scheduled him to see a neurologist, "and to take several other tests."  (*Id.*)  Dr. King also

---

[6] Lieutenant Medlin is not a party to this action.

8

issued Shabazz a "'Bottom Bunk Pass'" for six months. (*Id.*) Shabazz never met with a

neurologist. (*Id.*) At a later meeting with Dr. King in June of 2009, Shabazz alleges that,

because so much time had passed since the incident, Dr. King "felt that he needed [Shabazz] to

have another occur[e]nce (seizure/blackout) to further his prognosis." (*Id* ¶ 48.) In August of

2009, Shabazz met with Dr. Ellis at GCC medical. (*Id.* ¶ 49.) Dr. Ellis renewed Shabazz's

"Bottom Bunk Pass" for an additional six months. (*Id.*)

## D.    Grievances

Shabazz filed both informal and formal grievances against Brown and Maryland,

claiming that he was not treated quickly enough after his first seizure. Defendant Carpino, the

unit manager of Shabazz's unit, spoke to Shabazz about his informal grievance. (*Id.* ¶ 59–60.)

Carpino asked Shabazz if a physical altercation with Shabazz's cellmate, Anderson, occurred on

the night of the alleged seizure. (Carpino Aff. ¶ 5.) Shabazz assured Carpino that Anderson had

not attacked Shabazz, but that Shabazz had been injured as a result of the seizure. (Compl. ¶ 60.)

Shabazz's first grievance was determined to be founded. (*Id.* ¶ 84; Defs. Mem. Supp. Mot.

Summ. J. Ex. 4 ("Hinkle Aff.") ¶ 7.) However, Shabazz was not "compensated for his . . .

physical, Mental and Emotional injuries." (Compl. ¶ 84.) Rather, Defendant Carpino instructed

Brown, Maryland, and other staff members that, in the future, they should make a written report

of such incidents and obtain a written waiver in the event a prisoner refuses medical care.

(Carpino Aff. ¶ 4; Hinkle Aff. ¶ 6.)

Shabazz then filed an informal grievance against Dr. King[7] for improper medical care

alleging that Dr. King refused to allow Shabazz to see a neurologist and refused to schedule a

---

[7] The August 9, 2011 Order dismissed Dr. King as a defendant in this case. *Shabazz*,
2011 WL 3489661, at *11.

C.A.T. Scan for Shabazz. (Compl. ¶ 86.) Writing in response to this grievance, a GCC nurse

stated that Shabazz had been evaluated and that his file contained no documented "blackouts."

(Compl. Ex. E.) The response also stated that Shabazz had been referred to a neurologist for

evaluation. (*Id.*) Shabazz then filed a regular grievance stating the same complaint. (Compl.

¶ 91.) Defendant Alderman[8] found Shabazz's Level I grievance unfounded based on the

response of the Health Administrator, L. Owens.[9] (*Id.* ¶ 92.) Defendant Schilling found

Shabazz's Level II grievance unfounded based on this same information from the GCC medical

department. (*Id.* ¶ 94; Compl. Ex. H.)

## IV.  ANALYSIS

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff

must demonstrate that:  (1) that objectively the deprivation suffered or harm inflicted was

"'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently

culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (*quoting*

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). A medical need is "serious" if it "'has been

diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241

(4th Cir. 2008) (*quoting Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Webb v.*

*Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008) (*citing Ramos v. Lamm*, 639 F.2d 559, 575

(10th Cir. 1980)).

---

[8] Defendant Alderman was the Assistant Warden at GCC at the times relevant to
Shabazz's complaint. (Compl. 3.)

[9] Owens is not a party to this suit.

In the context of an allegation of cruel and unusual punishment as a result of delayed medical care, the objective-prong analysis does not end there. In addition to demonstrating a medical need that was objectively serious, a plaintiff must also establish that the delay in the provision of medical care "'resulted in substantial harm.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (*quoting Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *id.* at 754 (*quoting Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (identifying this additional requirement of the objective prong); *see Webb*, 281 F. App'x at 166–67 n.13 (explaining that where an Eighth Amendment claim is predicated on a delay in the provision of medical care, the plaintiff must demonstrate "'that the delay resulted in substantial harm.'" (*quoting Sealock*, 218 F.3d at 1210)). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citing cases); *see Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (*quoting Monmouth Cnty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

Regarding the second, subjective prong, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (*citing Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)). Deliberate indifference requires the plaintiff to show that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (*citing Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment

11

which is medically necessary and not to "that which may be considered merely desirable."

*Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

## A.    Liability of Brown, Maryland, and Scott

Shabazz predicates Claim Ten upon Scott's alleged delay in securing medical care for

Shabazz. Scott, upon approaching Shabazz and determining that something was wrong, quickly

began escorting, and eventually carrying, Shabazz to the medical department. (Compl. ¶¶ 40–

43.)  Scott's prompt, reasonable action reflects that he was attentive rather than indifferent to

Shabazz's medical needs. *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001) ("[A]n official

who responds reasonably to a known risk has not 'disregard[ed] an excessive risk to inmate

health or safety,' and has therefore not acted with deliberate indifference." (second alteration in

original) (*quoting Farmer*, 511 U.S. at 837)).  Accordingly, Claim Ten will be DISMISSED.

Shabazz predicates Claims One and Three upon Brown's and Maryland's alleged delays

in securing medical care for Shabazz.  Shabazz fails to show, as he must, that any delay in his

medical care caused him any substantial harm. *Mata*, 427 F.3d at 751.  Shabazz's first seizure

occurred on February 2, 2009 at approximately 1:15 a.m.  (Compl. ¶ 22.)  Shabazz was not

placed into the care of appropriate medical personnel until approximately 7 a.m. that morning—a

delay of roughly five hours and forty-five minutes. (*Id.* ¶¶ 38–45.)  Brown's and Maryland's

liability turns on their failure to secure Shabazz medical care during that window. *See Nelson v.*

*Hill*, No. 3:08cv603–HEH, 2011 WL 2358542, at *4 (E.D. Va. June 9, 2011) (*citing Oxendine*,

241 F.3d at 1277–79); *c.f. Iko*, 535 F.3d at 242 (holding that once an inmate has been placed into

the care of appropriate medical personnel, "'a nonmedical prison official will generally be

justified in believing that the prisoner is in capable hands.'" (*quoting Spruill v. Gillis*, 372 F.3d

218, 236 (3d Cir. 2004))). Thus, to prevail on his claims against Brown and Maryland, Shabazz

must show a substantial harm resulting from this five hour and forty-five minute delay in care.

*See Mata*, 427 F.3d at 751. Shabazz has failed to do so.

The only injuries that Shabazz sustained as a result of the nearly six-hour delay in

treatment are "scrape[s] to his . . . right knuckles and his . . . right knee," which occurred when

he went limp while being carried to GCC medical by Lieutenant Scott and Inmate Mikeel,

causing the three men to fall. (Compl. ¶ 42.) Shabazz's scrapes on his knuckles and knee,

uncomfortable as they were, do not rise to the level of a "lifelong handicap, permanent loss, or

considerable pain," *Garrett*, 254 F.3d at 950 (citing cases), and thus do not constitute substantial

harm. *Selmon v. North*, No. 7:02–CV–287–R, 2004 WL 2421603, at *2 (N.D. Tex. Oct. 28,

2004) ("An abrasion does not constitute a serious medical need." (*citing Siglar v. Hightower*,

112 F.3d 191, 193–94 (5th Cir. 1997); *Luong v. Hatt*, 979 F. Supp. 481, 486 (N.D. Tex. 1997)));

*see Parks v. Williams*, No. 3:01CV287, 2001 WL 34780939, at *3 (E.D. Va. Nov. 6, 2001) ("The

failure to 'dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild

headache or minor fatigue—the sorts of ailments for which many people who are not in prison

do not seek medical attention—does not . . . violate the Constitution.'" (alteration in original)

(*quoting Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996))); *cf. Siglar*, 112 F.3d at 193–94

(holding that a sore, bruised ear lasting for three days does not support an Eighth Amendment

claim). Because Shabazz fails to demonstrate substantial harm resulting from the delay in his

treatment, he fails to establish a claim of deliberate indifference against Brown and Maryland.

*Mata*, 427 F.3d at 751. Therefore, Claims One and Three will be DISMISSED.

13

**B.    Supervisory Defendants**

**1.    Warden Hinkle; Unit Manager Carpino**

Shabazz mentions Hinkle[10] in the body of the complaint only to assert that "upon information and belief, Defendant Hinkle . . . did have extensive knowledge of . . . negligen[ce] toward the prisoners housed at GCC." (Compl. ¶ 51.) Shabazz mentions Carpino only to relate that Carpino "called [Shabazz] to his office to speak with [Shabazz] about the informal complaint that was filed," and questioned whether Shabazz had been injured in a fight with his cellmate, Anderson.[11] (*Id.* ¶ 60.) Shabazz fails to demonstrate, as he must, how Hinkle and/or Carpino participated in any violation of his rights.

It appears to the Court that the only reason that Hinkle and Carpino have been named is because they acted in a supervisory capacity over other defendants. However, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (noting that the doctrine of *respondeat superior* is inapplicable to § 1983 actions). Shabazz fails to establish that Hinkle and/or Carpino, through their own individual actions, violated Shabazz's rights. Accordingly, Claims Four and Five will be DISMISSED.

---

[10] Defendant Hinkle is the Warden of GCC. (Hinkle Aff. ¶ 1.)

[11] Carpino asserts that he had no knowledge of the events occurring on February 2, 2009 until he received Shabazz's regular grievance on March 4, 2009. (Carpino Aff. ¶ 4.) Having received the grievance, Carpino "did follow up with the staff involved . . . and advised them that medical should have been called or Shabazz should have signed a medical refusal form." (*Id.*) Carpino admits that he asked whether Shabazz and his cellmate had gotten into a fight, but avers that such questions are "standard . . . when an offender receives an injury that was not witnessed by staff." (*Id.* ¶ 5.)

14

### 2.    Health Services Director Schilling; Assistant Warden Alderman

As stated above, to survive summary judgment, Shabazz must introduce evidence indicating Defendants were deliberately indifferent to his serious medical needs. *Estelle*, 429 U.S. at 106. Neither Schilling nor Alderman was directly responsible for Shabazz's medical care. These defendants supervised other prison personnel charged with providing medical care to Shabazz.

Shabazz fails to demonstrate that either Schilling or Alderman interfered with his medical care or denied Shabazz access to medical care. *See Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (discussing theories of supervisory liability for denial of adequate medical care). Instead, Shabazz asserts that Schilling and Alderman were deliberately indifferent to the inadequate medical care provided by the subordinate medical personnel. In *Farmer*, the Supreme Court emphasized that it is conscious disregard for intolerable risks that is the touchstone of the deliberate indifference standard:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837. Shabazz faces a fairly onerous task in demonstrating deliberate indifference in the present circumstances because reliance upon the expertise of prison doctors in treating inmates is generally appropriate for supervisory officials such as Schilling and Alderman. *Miltier*, 896 F.2d at 854–55; *see Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002). To overcome such reliance, the inmate must introduce evidence demonstrating that the supervisory official knew that the care provided by medical personnel was so obviously incompetent that it

posed a substantial risk of harm to the inmate's health. *See Miltier*, 896 F.2d at 855. Shabazz has not done so.

Here, Schilling and Alderman learned of Shabazz's dissatisfaction with the lack of treatment from Dr. King though their role in processing Shabazz's grievances. Both of these defendants state that they, after investigating the grievance, found that medical staff evaluated Shabazz and, though there were no witnesses to his seizure, referred him to a neurologist. (Compl. Exs. G, H.) Nevertheless, Schilling encouraged Shabazz to submit a sick call request in the event that he had any further issues. (Compl. Ex. H.)

Shabazz fails to introduce evidence suggesting that the reliance of Schilling and Alderman upon the assurances of medical professionals was unreasonable. *Miltier*, 896 F.2d at 855. Shabazz also fails to present any evidence indicating such reliance amounts to deliberate indifference. Accordingly, Claims Nine and Eleven will be DISMISSED.

## C.   The Virginia Department of Corrections

Shabazz names the Virginia Department of Corrections as a defendant in his 42 U.S.C. § 1983 complaint. (Compl. ¶ 10.) However, the Virginia Department of Corrections is not a "person" under § 1983.[12] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."). Accordingly, Shabazz's claims, so far as they implicate the Virginia Department of Corrections, will be DISMISSED.

---

[12] Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983 (emphasis added).

**D.     Claim for Injunctive Relief**

Shabazz also fails to demonstrate that he is entitled to injunctive relief. To survive summary judgment on his claim for injunctive relief, Shabazz must "come forward with evidence from which it can be inferred that the defendant-officials . . . are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Farmer*, 511 U.S. at 846. Shabazz has given no indication that he currently faces an "objectively intolerable risk of harm" from the lack of additional medical intervention at this time with respect to his occasional seizures. *Id.* Furthermore, the record indicates that Shabazz has ready access to medical care should the risk posed by his infrequent seizures increase. Accordingly, Shabazz's claim for injunctive relief will be DENIED.

## V.  CONCLUSION

For the above reasons, Claim Two will be DISMISSED WITHOUT PREJUDICE and Shabazz's remaining claims will be DISMISSED WITH PREJUDICE. Defendants' Motion for Summary Judgment (Docket No. 41) will be GRANTED and the action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

Date: 2-9-12
Richmond, Virginia

/s/
James R. Spencer
United States District Judge